



STAMP AND RETURN
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

BY _____ DEPUTY

| | |
|---|---|
| ELIZABETH GILLESPIE,<br>507 Montgomery St.<br>Laurel, MD 20707, and<br><br>DAVID IRVINE<br>507 Montgomery St.<br>Laurel, MD 20707, and<br><br>ERIN WHITNEY<br>6313 Mockingbird Street<br>Ventura, CA 93003, and<br><br>CARY BARBIN<br>327 Talbott Avenue<br>Laurel, MD 20707, and<br><br>KATHRYN ELIZABETH HALE<br>14012 Vista Drive, Unit 16A<br>Laurel, MD 20707, and<br><br>BRIAN LEFFLER<br>2606 23rd Road North<br>Arlington, VA 22207, and<br><br>XIOMARA PORRAS<br>9035 - D North Laurel Rd.<br>Laurel, MD 20723,<br><br>            Plaintiffs,<br><br>v.<br><br>LAUREL REGIONAL HOSPITAL,<br>7300 Van Dusen Road<br>Laurel, MD 20707,<br><br>            Defendant. | Civil Action No._____ |

## COMPLAINT FOR INJUNCTIVE RELIEF
## AND FOR COMPENSATORY AND PUNITIVE DAMAGES

NOW COME Plaintiffs Elizabeth Gillespie, David Irvine, Erin Whitney, Cary Barbin, Kathryn Elizabeth Hale, Brian Leffler, and Xiomara Porras (collectively "Plaintiffs"), by and through their undersigned counsel, and file this Complaint against Defendant Laurel Regional Hospital ("Laurel Hospital," or the "Hospital") and, in support thereof, allege as follows:

## STATEMENT OF THE CASE

1.      Plaintiffs are deaf individuals that have sought and received medical treatment at Laurel Hospital. Each has depended on Laurel Hospital for a variety of inpatient, emergency and outpatient medical services, due largely to the Hospital's proximity to their respective homes. Plaintiffs will likely continue to depend upon Laurel Hospital for a variety of inpatient, emergency and outpatient medical treatment in the future.

2.      To communicate effectively in medical situations – especially emergency medical situations – Plaintiffs require a live, qualified sign language interpreter. The alternative methods of communication utilized by Laurel Hospital, which may be acceptable in non-medical settings, in Plaintiffs' cases have proven inadequate. Plaintiffs sought medical treatment at Laurel Hospital because either they or a family member were sick, injured and/or experiencing severe pain, necessitating them coming to the Hospital's emergency room. Such medical settings, in which Plaintiffs' health, cognizance and concentration have already been compromised, require the provision of a live and in-person, qualified sign language interpreter. Hearing patients would expect and receive nothing less than live, person-to-person medical service with oral communications between themselves and Hospital staff. Deaf patients, such as Plaintiffs, should receive nothing less than what would be provided for hearing patients. In fact, given their disability, deaf patients should receive greater communication efforts from Hospital staff, not less.

3.     On each occasion when Plaintiffs visited Laurel Hospital for treatment, they and/or others made repeated requests for the assistance of a live and in-person, qualified sign language interpreter to enable the plaintiffs to communicate with doctors, nurses and other Hospital staff, to understand and participate in their medical treatment and to receive the full benefit of the Hospital's services. Despite specific and repeated requests for live interpreter services, however, Laurel Hospital failed and refused to provide Plaintiffs with live qualified sign language interpreters incident to the administration of medical treatment.

4.     Instead, Plaintiffs were forced to communicate through cryptic notes or lip-reading. Lip-reading, the ability to understand the speech of another by watching the speaker's lips, is an extremely speculative means of communication. Only approximately 30-40% of the spoken sounds of our language are visible, and many of those appear identical on the lips. Even the very best lip-readers, in an ideal one-to-one situation, have been found to understand only 26% of what is said.

5.     In limited circumstances, Plaintiffs were able to utilized Video Remote Interpreting ("VRI"). VRI uses video conferencing technology to provide remote interpreting services. The sign language interpreter is located at a remote location and, through video conferencing, the deaf individual and the interpreter can view each other. Facing a small camera mounted on top of a computer, the deaf individual signs to the interpreter, who then voices what has been signed and interprets what is said in response by hearing participants which interpretation is displayed on a computer monitor for viewing by the deaf participant. In the specific instances facing these Plaintiffs, VRI was an insufficient mode of communication.

6.     As a consequence, Plaintiffs have been denied the benefit of effective communication with physicians and health care providers at Laurel Hospital, have been unable to provide informed

consent to treatment, have been denied the opportunity to participate in their treatment, and have been denied the full benefit of the health care services provided by Defendant Laurel Hospital as required by the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*, and Section 504 of the Rehabilitation Act (the "Rehabilitation Act"), 29 U.S.C. § 794.

## JURISDICTION AND VENUE

7.     Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331 because this case involves Laurel Hospital's multiple and repeated violations of both the ADA and the Rehabilitation Act. This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(4) because this case involves a violation of Plaintiffs' civil rights.

8.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because Defendant is located in and has its principal (and exclusive) place of business in Prince George's County, Maryland, and the events giving rise to the Complaint occurred in Prince George's County, Maryland.

## THE PARTIES

9.     Plaintiff ELIZABETH GILLESPIE is a resident of Laurel, Maryland. Ms. Gillespie is deaf, and therefore qualifies as an individual with a disability as defined by both the ADA, 42 U.S.C. § 12102(2) and the Rehabilitation Act, 29 U.S.C. § 705(2)(B). Ms. Gillespie communicates through ASL. Ms. Gillespie has sought and received, and will likely continue to seek, medical treatment from Laurel Hospital, which is approximately two miles from her home.

10.     Plaintiff DAVID IRVINE is a resident of Laurel, Maryland. Mr. Irvine is deaf, and therefore qualifies as an individual with a disability as defined by both the ADA, 42 U.S.C. § 12102(2) and the Rehabilitation Act, 29 U.S.C. § 705(2)(B). Mr. Irvine communicates through ASL. Mr. Irvine has sought and will likely continue to seek medical treatment from Laurel Hospital, which is

approximately two miles from his home.  Mr. Irvine has accompanied and will likely continue to accompany his wife, Elizabeth Gillespie, to Laurel Hospital for purposes of assisting her with, and participating in, her medical treatment decisions.

11.    Plaintiff ERIN WHITNEY was a resident of College Park, Maryland at all times relevant to the Complaint. Ms. Whitney is deaf, and therefore qualifies as an individual with a disability as defined by both the ADA, 42 U.S.C. § 12102(2)  and the Rehabilitation Act, 29 U.S.C. § 705(2)(B). Ms. Whitney communicates through American Sign Language ("ASL").  Ms. Whitney has sought and received medical treatment from Laurel Hospital, which at all times relevant to the Complaint was approximately eight miles from her prior residence.

12.    Plaintiff CARY BARBIN is a resident of Laurel, Maryland.  Mr. Barbin is deaf, and therefore qualifies as an individual with a disability as defined by both the ADA, 42 U.S.C. § 12102(2) and the Rehabilitation Act, 29 U.S.C. § 705(2)(B).  Mr. Barbin communicates through ASL.  Mr. Barbin has sought and received, and will likely continue to seek, medical treatment from Laurel Hospital, which is approximately two miles from his home.

13.    Plaintiff KATHRYN HALE is a resident of Laurel, Maryland.  Ms. Hale is deaf, and therefore qualifies as an individual with a disability as defined by both the ADA, 42 U.S.C. § 12102(2) and the Rehabilitation Act, 29 U.S.C. § 705(2)(B).  Ms. Hale communicates through ASL.  Ms. Hale has sought and received, and will likely continue to seek, medical treatment from Laurel Hospital, which is approximately two miles from her home.

14.    Plaintiff BRIAN LEFFLER was a resident of Laurel, Maryland at all times relevant to the Complaint.  Mr. Leffler is deaf, and therefore qualifies as an individual with a disability as defined by both the ADA, 42 U.S.C. § 12102(2) and the Rehabilitation Act, 29 U.S.C. § 705(2)(B).  Mr. Leffler

communicates through ASL. Mr. Leffler has sought and received, and will likely continue to seek, medical treatment from Laurel Hospital, which is approximately two to three miles from his home.

15.     Plaintiff XIOMARA PORRAS is a resident of Laurel, Maryland. Ms. Porras is deaf, and therefore qualifies as an individual with a disability as defined by both the ADA, 42 U.S.C. § 12102(2) and the Rehabilitation Act, 29 U.S.C. § 705(2)(B). Ms. Porras is unable to communicate effectively through reading or writing, and communicates effectively only through ASL. Ms. Porras has sought and received, and will likely continue to seek, medical treatment for herself and for her family from Laurel Hospital, which is approximately five miles from her home.

16.     Laurel Hospital, upon information and belief, operates in Prince George's County, Maryland at 7300 Van Dusen Road, Laurel, MD 20707. Defendant is affiliated with Dimension Healthcare Systems, a corporation located at 3001 Hospital Drive, Suite 4000, Cheverly, MD 20785. Laurel Hospital is a Maryland business and is a place of public accommodation as defined by the ADA, 42 U.S.C. § 12181(7)(F). The Hospital receives federal financial assistance pursuant to the Rehabilitation Act and is therefore a federal recipient subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

## FACTS ENTITLING PLAINTIFFS TO RELIEF

17.     Paragraphs 1 through 15 are adopted and incorporated by reference as though expressly set forth.

**A.     Laurel Hospital Failed to Provide Plaintiff Gillespie with an Appropriate Auxiliary Aid As Necessary to Ensure Effective Communication, And Therefore Denied Her Full and Equal Medical Treatment Because of Her Disability.**

18.     On or about November 1, 2003, Ms. Gillespie went to the Laurel Hospital emergency room to obtain medical treatment for severe abdominal pain, nausea, and vomiting, among other

symptoms. On numerous prior visits, Laurel Hospital failed to provide Ms. Gillespie with a sign language interpreter. Nevertheless, because Laurel Hospital is the closest hospital to her home and Ms. Gillespie needed emergency medical care, she returned to Laurel Hospital.

19.   Immediately after registering at the Hospital's front desk on November 1, 2003, Ms. Gillespie was admitted to the emergency room because of her serious condition. Ms. Gillespie's husband, David Irvine, who is also deaf and who cannot lip-read, accompanied her to the Hospital. While Mr. Irvine is deaf and cannot read lips, he can speak clearly enough to be understood. By contrast, Ms. Gillespie has limited lip reading ability but her speech is not clear. Because of her serious medical condition and severe pain, however, Ms. Gillespie's ability to read lips was compromised during this hospital visit.

20.   Upon Ms. Gillespie's admittance, both she and her husband requested a live, in-person sign language interpreter so that they could communicate with the doctors, nurses and other Hospital staff. Laurel Hospital's staff told them that it did not have any sign language interpreter. Ms. Gillespie and Mr. Irvine repeatedly requested an interpreter. After waiting for some time, a member of the Hospital staff finally mentioned that the Hospital has a VRI device. The staff informed Ms. Gillespie, however, that the room containing the VRI device was not available at that time because the room was being used by another patient. After waiting approximately two hours, Ms. Gillespie was finally moved to the room containing the VRI device. Due to her inability to communicate with the Hospital staff during the two-hour delay, however, Ms. Gillespie did not understand the medical advice or treatment she received during that time.

21.   After moving Ms. Gillespie to the room with the video interpreting device, it took the improperly and inadequately trained Hospital staff another 20-30 minutes to set up and operate the

equipment. The doctor communicated with Ms. Gillespie using the video interpreting device. This consultation lasted approximately 10 minutes. During this time, the doctor advised Ms. Gillespie that he did not know the cause of her severe pain, but communicated to her that he would like to perform some tests. The doctor informed Ms. Gillespie that she would undergo an x-ray and probably a CT-scan. The Hospital staff never utilized the VRI device again during Ms. Gillespie's visit.

22.     Following the consultation, Ms. Gillespie and Mr. Irvine waited in her room before the Hospital staff returned to prepare her for her x-rays. During this procedure, as well as during all subsequent procedures, tests, and doctor consultations, Ms. Gillespie did not receive, and the Hospital either failed or refused to provide access to, the VRI device and denied her repeated requests for a live sign language interpreter or any other alternative mode of communication. The Hospital staff wrote notes to her only in a few select and extreme circumstances and only after Ms. Gillespie begged and continuously motioned for some sort of communication. Even then, the Hospital staff limited written communication to a few words. As a result, Ms. Gillespie and Mr. Irvine received only a partial and limited understanding of her medical condition and treatment. Rather than provide effective communication, the Hospital staff insisted on speaking to Ms. Gillespie and Mr. Irvine verbally despite the fact that he cannot read lips and Ms. Gillespie's ability to lip-read was compromised by her medical condition.

23.     After being x-rayed, Ms. Gillespie was returned to her patient room where she waited for some time before the doctor returned to consult with her and her husband. The doctor verbally informed them that Ms. Gillespie had an enlarged heart and that Ms. Gillespie would need to undergo a CT-scan. As this diagnosis was communicated only verbally, Ms. Gillespie and Mr. Irvine were forced to attempt

to rely solely on the vagaries of lip-reading to comprehend this critical information. They did not fully understand the doctor's diagnosis or the medical treatment she was going to receive.

24.     Ms. Gillespie and Mr. Irvine waited another few hours (almost five hours after she was admitted to the emergency room) before a male Hospital attendant arrived to take her to the CT-scan room. Neither Ms. Gillespie nor Mr. Irvine could understand the male attendant's instructions to them. As a result, Ms. Gillespie repeatedly asked (by signing to Mr. Irvine who relayed her request verbally) that the attendant communicate with them in writing so that they could better understand the medical services he was to provide. The attendant ignored and refused the request for written communication. Instead, the male attendant's communication was limited to his pulling and snapping her bra's strap when he wanted her to remove it. Ms. Gillespie was humiliated, embarrassed and violated by this incident.

25.     The male attendant nevertheless took Ms. Gillespie to the CT-scan room. Mr. Irvine followed. While the attendant prepared for the CT-scan, Ms. Gillespie (through Mr. Irvine) repeatedly requested that the male attendant communicate with her in writing about the procedure. Neither Ms. Gillespie not Mr. Irvine understood the procedure. The attendant angrily and steadfastly refused to communicate with her in writing. She felt afraid and, as a result, left the CT-scan room and returned to her patient room requesting (through Mr. Irvine) that a nurse be present during the CT-scan.

26.     After undergoing the CT-scan in the presence of a female nurse, Ms. Gillespie and Mr. Irvine returned to her patient room and waited an additional hour (almost seven and one half hours after she was first admitted to the emergency room) before a doctor returned to provide Ms. Gillespie with a sedative for her pain. The doctor left without providing Ms. Gillespie with any diagnosis or update on her condition or the results of any test.

27.    Because she felt exasperated with her treatment and uninformed about her medical condition arising from the Hospital's refusal and failure to communicate with her or her husband adequately, Ms. Gillespie wanted to leave the Hospital.

28.    After waiting another few hours or so, a different doctor arrived at Ms. Gillespie's room to provide her and her husband with a summation consultation (almost ten hours after Ms. Gillespie was admitted to the emergency room).  The doctor informed them that Ms. Gillespie should be admitted to the Hospital for additional tests to determine the source of her pain.  He communicated with them verbally and then after Mr. Irvine assisted, he sparsely used written notes.  The doctor's notes were short, confusing and cryptic.  Because Ms. Gillespie had been sedated and Mr. Irvine does not read lips, they could not understanding the verbal discussion.  They were also confused about the written communications since those communications were so vague.  Ms. Gillespie informed the doctor through Mr. Irvine that she wanted to leave the Hospital.  In response, the doctor turned, and began to leave the room.  Mr. Irvine stopped him and asked about the earlier doctor's reference to his wife's heart being enlarged.  Ms. Gillespie and Mr. Irvine believe the doctor communicated to them that the doctor who saw Ms. Gillespie earlier during her visit diagnosed her with congestive heart failure.  The doctor cavalierly recommended that Ms. Gillespie go to another emergency room at a different hospital for treatment.  Ms. Gillespie's discharge papers and all other written materials she received from the Hospital failed to mention the lung problem and/or the heart condition for which she was ultimately diagnosed.

29.    Ms. Gillespie's medical treatment was deficient because Laurel Hospital denied her full and equal medical treatment based on her disability.  Moreover, Ms. Gillespie was excluded from participation in, denied the benefits of, and subjected to discrimination in the receipt of medical services.

Consequently, she sustained physical and emotional injuries, and incurred damages in an amount to be proven at trial.

**B.    Laurel Hospital Failed to Provide Plaintiff Irvine with an Appropriate Auxiliary Aid As Necessary to Ensure Effective Communication, And Therefore Denied Him Full and Equal Medical Treatment Because of His Disability.**

30.    Ms. Gillespie's husband, David Irvine, also has suffered from Laurel Hospital's discriminatory failure to provide effective communication. Mr. Irvine accompanied his wife to Laurel Hospital during her November 1, 2003 visit. Ms. Gillespie relies heavily on Mr. Irvine's participation in making her medical decisions. By refusing to provide a sign language interpreter or other effective communication aid during the visit, Laurel Hospital denied Mr. Irvine full and equal medical treatment because of his disability. Moreover, Mr. Irvine was excluded from participation in, denied the benefits of, and subjected to discrimination in the receipt of medical services for his wife. This denial was specifically based on Mr. Irvine's disability, and has caused him emotional injuries. Mr. Irvine incurred damages in an amount to be proven at trial.

**C.    Laurel Hospital Failed to Provide Plaintiff Whitney with an Appropriate Auxiliary Aid As Necessary to Ensure Effective Communication, And Therefore Denied Her Full and Equal Medical Treatment Because of Her Disability.**

31.    On or about December 24, 2003, Ms. Whitney went to Laurel Hospital to obtain medical treatment. Ms. Whitney and Karl Ewan, a deaf friend of Ms. Whitney's who had accompanied her to the Hospital, both requested a live, in-person sign language interpreter so that Ms. Whitney could communicate with the doctors, nurses and other Hospital staff treating her. The Hospital staff informed Ms. Whitney and Mr. Ewan that an interpreter was "on the way," however, when she was admitted into a room, the Hospital staff told she and Mr. Ewan that they would have to use the VRI.

32.     The Hospital staff was inadequately trained and unable to operate the VRI device until assisted by Mr. Ewan.

33.     While Mr. Ewan was assisting with the set-up of the VRI device, a doctor entered the hospital room, but left without treating Ms. Whitney because he and Ms. Whitney could not communicate.

34.     Once the VRI device was connected, neither Ms. Whitney nor Mr. Ewan could understand the video interpreter due to the poor quality of the video transmission. Ms. Whitney repeated her request for a live sign language interpreter, but the Hospital again refused to provide one. As a result, Ms. Whitney could not effectively communicate with the Hospital staff.

35.     Ms. Whitney's medical treatment was deficient because Laurel Hospital failed to accommodate her disability. Consequently, she sustained physical and emotional injuries, and incurred damages in an amount to be proven at trial.

36.     On or about April 25, 2004, despite Laurel Hospital's prior failures and refusal to provide her with a qualified live sign language interpreter, Ms. Whitney returned to the Hospital for emergency medical treatment since, at the time, it was the closest hospital to her home. Upon her arrival at the Hospital, Ms. Whitney vomited several times and fainted. Prior to fainting and again upon regaining consciousness, Ms. Whitney requested a live sign language interpreter so that she could communicate with the doctors, nurses and other Hospital staff treating her. Ms. Whitney's roommate Marie Campbell, who had accompanied her to the Hospital, requested on three separate occasions that the Hospital provide Ms. Whitney with a live, in-person sign-language interpreter. The Hospital staff told Ms. Campbell that an interpreter was "on the way."

37.     After feeling faint again, Ms. Whitney lay down on a nearby bed.  A member of the Hospital staff, who did not know that Ms. Whitney was deaf, became angry with Ms. Whitney for lying on the bed, then hit Ms. Whitney in the knee, twisted her arm and dragged her off of the bed.  Ms. Campbell and Ms. Whitney made repeated requests to file a complaint about the nurse's misconduct.  The Hospital staff told Ms. Campbell and Ms. Whitney  that they would send someone to start the complaint procedure.  That person never arrived.

38.     Subsequently, the Hospital staff placed Ms. Whitney in a room with a VRI device.  The Hospital staff was improperly trained, was not familiar with the device and spent 30-40 minutes trying to set it up.  During this period, and in a repeat of her first visit, a doctor entered the room, saw that the VRI machine was not yet ready and left without providing any medical assistance to Ms. Whitney.  The doctor ultimately returned once the VRI device was operational.  Ms. Whitney found communication through the VRI device difficult and ineffective due to poor picture quality on the video monitor, combined with the fact that it requires a patient to sit up to see the screen.  Due to her illness, Ms. Whitney was unable to sit up in order to communicate through the VRI device.  Ms. Whitney repeatedly tried to communicate with the Hospital staff to explain that she did not understand the video interpreter, and repeatedly requested a live sign language interpreter so that she could communicate effectively with the doctor and other Hospital staff.  Each time the Hospital staff rebuffed and rejected Ms. Whitney's requests for a live interpreter and told her that she would have to use the video interpreter.

39.     The doctor treating Ms. Whitney also insisted on using only the VRI device to communicate with her.  It was through this mode of communication that the doctor advised Ms. Whitney that she "might" be suffering from meningitis.  At the time of this communication from the doctor, Ms. Whitney was scared, confused and light-headed from her illness.  Given the severity of what she

believed the doctor was communicating (*i.e.*, that she had a potentially life-threatening illness), Ms. Whitney reiterated her request for a live sign language interpreter to clarify what the doctor was telling her, and to ask some follow-up questions. The doctor refused her request for an interpreter and, adding further to Ms. Whitney's confusion, upon her discharge the next day, formally diagnosed her as suffering from the flu, with no additional mention of meningitis.

40.     A short while after returning home from the Hospital, Ms. Whitney experienced continued nausea, faintness and a very high fever. She returned to Laurel Hospital for treatment on the afternoon of April 26, 2004, and again requested a live sign language interpreter. Ms. Campbell, who again accompanied Ms. Whitney to the Hospital, also made several requests for a live, in-person sign language interpreter. Laurel Hospital again failed and refused to provide a live sign language interpreter, insisting instead on using the VRI device.

41.     The Hospital staff again struggled to set up the VRI device. Even after the video interpreting device was operational, as during her prior visit, Ms. Whitney could not see the VRI screen clearly from her position on the treatment table. In response to this situation, the doctor employed the assistance of Ms. Campbell, who is also deaf and communicates through ASL, to relay the interpreter's messages from the VRI device to Ms. Whitney. Through this attenuated means of communication, the doctor informed Ms. Whitney that she probably suffered from meningitis and would need to undergo a spinal tap. Neither the attending physician nor any other member of the Hospital staff advised Ms. Whitney as to what the procedure would entail. Ms. Whitney again requested a live sign language interpreter from the Hospital, and the Hospital again refused her request.

42.     The Hospital staff performed the spinal tap procedure without Ms. Whitney's written consent. Ms. Whitney never received any instructions regarding the spinal tap procedure, and no

interpreter was provided while the procedure was conducted, despite Ms. Whitney's repeated requests. The Hospital staff turned off the video interpreting device while conducting the spinal tap procedure. Two nurses held Ms. Whitney down as the procedure was conducted.

43.     After the procedure was completed, the Hospital staff failed to convey any post-procedure instructions or restrictions to Ms. Whitney, including that she remain immobile for a period of time following the procedure, which is standard procedure following a spinal tap. Specifically, after a spinal tap is performed, doctors typically advise patients to lay flat for a few hours in order to equilibrate fluid pressure. Significant complications can arise if a patient moves too soon after undergoing a spinal tap procedure. Under such circumstances, a patient can suffer from prolonged headaches, nausea and imbalance in equilibrium. In severe cases, nerve damage and/or inner-cranial pressure can result. In Ms. Whitney's case, shortly after her spinal tap procedure was complete, and absent any instruction to remain still, Ms. Whitney moved. She subsequently experienced, and continues to suffer from, among other problems, headaches, nausea, faintness and an imbalance in equilibrium.

44.     After the spinal tap procedure was completed, another friend of Ms. Whitney's, Heidi Holmes, came in to check on Ms. Whitney. Upon seeing there was no interpreter and listening to Ms. Whitney's complaints for an interpreter, Ms. Holmes made a few additional requests to the Hospital staff for an interpreter. The Hospital continued to refuse to provide a live interpreter for Ms. Whitney.

45.     Following the spinal tap, Ms. Whitney tested positive for viral meningitis and was re-admitted to the Hospital on or about the evening of April 26, 2004. She remained in the Hospital for an additional 2-3 days, until her discharge on April 29, 2004. During that entire time, the VRI device was not available for her use. Although the equipment was brought into her room, no one from the Hospital staff set up the equipment for use, despite her repeated requests for an interpreter.

46.     Although Ms. Whitney requested on multiple occasions that the Hospital provide her with a working TTY phone and a closed caption television, the Hospital refused to accommodate her requests (as required by Department of Justice Regulations, 28 C.F.R. 36.303(d) and (e)).

47.     The Hospital also failed to provide a live sign language interpreter or the VRI device for Ms. Whitney's discharge from the Hospital, despite the fact that she requested one. The Hospital staff provided discharge instructions to Ms. Whitney's mother instead of providing them to her directly, and required Ms. Whitney's mother to sign the discharge papers.

48.     Ms. Whitney's medical treatment was deficient because Laurel Hospital denied her full and equal medical treatment because of her disability. Moreover, Ms. Whitney was excluded from participation in, denied the benefits of, and subjected to discrimination in the receipt of medical services. Consequently, she sustained physical and emotional injuries, and incurred damages in an amount to be proven at trial.

**D.     Laurel Hospital Failed to Provide Plaintiff Barbin with an Appropriate Auxiliary Aid As Necessary to Ensure Effective Communication, And Therefore Denied Him Full and Equal Medical Treatment Because of His Disability.**

49.     On or about March 19, 2004, Mr. Barbin went to Laurel Hospital to obtain medical treatment. Mr. Barbin requested a live, in-person sign language interpreter so that he could communicate with the doctors, nurses and other Hospital staff treating him. The Hospital staff informed him that it did not have a sign language interpreter. Because the Hospital had no interpreter, Mr. Barbin's hearing roommate, Michael Jacobus, who had accompanied him to the Hospital, attempted to help Mr. Barbin understand what was happening.

50.     The Hospital staff insisted on using Mr. Jacobus to interpret for Mr. Barbin. Both Mr. Barbin and Mr. Jacobus informed the Hospital staff that Mr. Jacobus was not a certified sign language

interpreter, and that neither was comfortable in having Mr. Jacobus interpret in this situation.  A member

of the Hospital staff responded that they "could manage" by using Mr. Jacobus to interpret.  Over Mr.

Barbin's objection, the Hospital staff took Mr. Barbin's information and commenced the examination,

using Mr. Jacobus as the interpreter.

51.     When the emergency room doctor arrived to treat Mr. Barbin, both Mr. Barbin and Mr.

Jacobus again requested a certified sign language interpreter.  The doctor told them that the Hospital did

not have an interpreter, and insisted again on using Mr. Jacobus to interpret.  Both Mr. Barbin and Mr.

Jacobus informed the doctor that Mr. Jacobus is not a certified sign language interpreter and is not

sufficiently skilled to interpret in medical situations.  Moreover, neither individual was comfortable with

the Hospital's use of Mr. Jacobus to interpret in this type of private situation.

52.     Laurel Hospital never obtained Mr. Barbin's permission to disclose confidential medical

information to Mr. Jacobus.  Mr. Barbin's medical treatment was deficient because Laurel Hospital

denied him full and equal medical treatment because of his disability.  Moreover, Mr. Barbin was

excluded from participation in, denied the benefits of, and subjected to discrimination in the receipt of

medical services.  Consequently, he sustained physical and emotional injuries, and incurred damages in

an amount to be proven at trial.

**E.    Laurel Hospital Failed to Provide Plaintiff Hale with an Appropriate Auxiliary Aid
As Necessary to Ensure Effective Communication, And Therefore Denied Her Full and
Equal Medical Treatment Because of Her Disability.**

53.     On or about August 5, 2002, Ms. Hale sought medical treatment from Laurel Hospital.

Upon arriving at the Hospital, Ms. Hale requested a live, in-person sign language interpreter so that she

could communicate with the doctors, nurses and other Hospital staff treating her.  The Hospital did not

provide a sign language interpreter.  Instead, the Hospital insisted on Ms. Hale reading lips and passing

written notes to communicate with the Hospital staff. While this form of communication may be appropriate in a non-medical setting, it was inappropriate in a hospital setting where Ms. Hale's health was already compromised.

54.     Ms. Hale was not afforded any communication aid during her medical treatment while at Laurel Hospital on this date. Ms. Hale's medical treatment was deficient because Laurel Hospital denied her full and equal medical treatment because of her disability. Moreover, Ms. Hale was excluded from participation in, denied the benefits of, and subjected to discrimination in the receipt of medical services. Consequently, she sustained physical and emotional injuries, and incurred damages in an amount to be proven at trial.

55.     On or about April 26, 2003, Ms. Hale again sought medical treatment from Laurel Hospital. Upon arriving at the Hospital, Ms. Hale again requested a live sign language interpreter so that she could communicate with the doctors, nurses and other Hospital staff treating her. The Hospital did not provide a live sign language interpreter. Instead, the Hospital insisted on using the VRI device. The improperly and inadequately trained Hospital staff was unable to operate the video interpreting equipment. Observing the difficulty the Hospital staff encountered with the video interpreting device, Ms. Hale reiterated her request that the Hospital provide her with a live, in-person sign language interpreter. The Hospital denied her request. As a result, Ms. Hale was not afforded any communication aid during her medical treatment while at Laurel Hospital on this date. Ms. Hale's medical treatment was deficient because Laurel Hospital denied her full and equal medical treatment because of her disability. Moreover, Ms. Hale was excluded from participation in, denied the benefits of, and subjected to discrimination in the receipt of medical services. Consequently, she sustained physical and emotional injuries, and incurred damages in an amount to be proven at trial.

56.     On or about August 12, 2004, Ms. Hale again sought medical treatment from Laurel Hospital. Upon arriving at the Hospital, Ms. Hale again requested a live sign language interpreter so that she could communicate with the doctors, nurses and other Hospital staff treating her. The Hospital did not provide a live sign language interpreter. Instead, the Hospital again insisted on using the VRI device. Ms. Hale watched the improperly and inadequately trained Hospital staff attempt to operate the video interpreting equipment for two hours without success. Observing the continued difficulty the Hospital staff encountered with the video interpreting equipment, Ms. Hale reiterated her request that the Hospital provide her with a live, in-person sign language interpreter. The Hospital denied her request. As a result, Ms. Hale was not afforded any communication aid during her medical treatment while at Laurel Hospital on this date. Ms. Hale's medical treatment was deficient because Laurel Hospital denied her full and equal medical treatment because of her disability. Moreover, Ms. Hale was excluded from participation in, denied the benefits of, and subjected to discrimination in the receipt of medical services. Consequently, she sustained physical and emotional injuries, and incurred damages in an amount to be proven at trial.

**F.      Laurel Hospital Failed to Provide Plaintiff Leffler with an Appropriate Auxiliary Aid As Necessary to Ensure Effective Communication, And Therefore Denied Him Full and Equal Medical Treatment Because of His Disability.**

57.     On or about, October 27, 2003, Mr. Leffler sought emergency medical treatment at Laurel Hospital. Mr. Leffler was accompanied to the Hospital by two friends, Mr. Barbin, a co-plaintiff in this action, and a hearing friend, Michael Jacobus, who would accompany Mr. Barbin to the Hospital on a later occasion. Upon arriving at the Hospital, Mr. Jacobus requested a live, in-person sign language interpreter on Mr. Leffler's behalf so that Mr. Leffler could communicate effectively with the doctors, nurses and other Hospital staff. The Hospital registration nurse informed them that it did not have a sign

language interpreter.  Instead, the nurse offered the use of a machine that purportedly would allow Mr. Leffler to communicate with the Hospital doctors and staff.  Not wanting to delay to his friends any further, and having learned that the Hospital would provide him with a communication aid, Mr. Leffler advised Mr. Barbin and Mr. Jacobus that they could leave the Hospital.

58.     After waiting for approximately thirty minutes, the registration nurse advised Mr. Leffler that the machine she had referenced earlier was not available, and asked Mr. Leffler if he was able to read lips.  Mr. Leffler told the registration nurse that he did not read lips well, and expressed his displeasure with the prospect of undergoing a medical examination in this manner.  The registration nurse nevertheless insisted on trying to communicate with Mr. Leffler through lip-reading.  This method of communication proved ineffective, however, given Mr. Leffler's general difficulty with lip-reading coupled with his then-existing medical condition which made intense concentration very difficult.

59.     Despite his earlier request for a live sign language interpreter, and despite the Hospital's original representation that a machine for interpreting would be provided, the doctor examined Mr. Leffler without the assistance of an interpreter or other communication aid.  The doctor tried to communicate through written notes, but this attempt limited the depth of questions Mr. Leffler could ask in an attempt to understand fully the diagnosis and treatment.  Moreover, the doctor became frustrated and impatient with having to communicate with Mr. Leffler in this fashion, and rushed through Mr. Leffler's examination.  Mr. Leffler attempted to ask the doctor questions, but the doctor cut him short, issued a prescription and ended the examination.

60.     Mr. Leffler's medical treatment was deficient because Laurel Hospital denied him full and equal medical treatment because of his disability.  Moreover, Mr. Leffler was excluded from participation in, denied the benefits of, and subjected to discrimination in the receipt of medical services.

Consequently, he sustained physical and emotional injuries, and incurred damages in an amount to be proven at trial.

**G.     Laurel Hospital Failed to Provide Plaintiff Porras with an Appropriate Auxiliary Aid As Necessary to Ensure Effective Communication, And Therefore Denied Her Full and Equal Medical Treatment Because of Her Disability.**

61.     On or about May 5, 2003, Ms. Porras's hearing son, Rene Porras, was taken to Laurel Hospital to obtain treatment for seizures that he had been experiencing.  It was later determined that Rene Porras had a potentially life-threatening condition with three abscesses on his brain.  During the visit, Rene was in and out of consciousness and, at times, unable to respond to the Hospital staff.  Ms. Porras was responsible for her son's medical care given his periodic state of unconsciousness.

62.     Upon arriving at Laurel Hospital, Ms. Porras requested a live, in-person sign language interpreter so that she could communicate with the doctors, nurses and other Hospital staff treating her son.  The Hospital informed her that it did not have a sign language interpreter.  Ms. Porras's daughter, Rebecca Porras Davis, a certified sign language interpreter who accompanied her mother to the Hospital, volunteered to provide interpreting services.  The Hospital refused to allow Ms. Davis to enter her brother's room to provide interpreting services.

63.     Ms. Porras and her daughter reiterated their request that the Hospital provide a sign language interpreter.  Ms. Davis attempted to give the Hospital staff phone numbers of various agencies in the area that would provide a certified sign language interpreter.  The Hospital staff denied their request, and failed and refused to provide a sign language interpreter.

64.     Ms. Porras and her daughter requested that the Hospital at the very least provide a video interpreting device through which Ms. Porras could communicate regarding her son's medical treatment.  The Hospital staff denied that request as well.

65.     As a result, Ms. Porras was forced to make decisions affecting her son's medical treatment without the benefit of a sign language interpreter.  By refusing to provide a sign language interpreter or other effective communication aid during the visit, Laurel Hospital denied Ms. Porras full and equal medical treatment because of her disability.  Moreover, Ms. Porras was excluded from participation in, denied the benefits of, and subjected to discrimination in the receipt of medical services for her son.  This denial was specifically based on Ms. Porras's disability, and has caused her emotional injuries.  Ms. Porras incurred damages in an amount to be proven at trial.

### COUNT ONE

### (Violation of Americans with Disabilities Act)

66.     Paragraphs 1 through 65 of this Complaint are incorporated by reference as though fully set forth herein.

67.     At all times relevant to this action, the ADA, 42 U.S.C. §§ 12101, *et seq.* was in full force and effect and applied to Defendant's conduct.

68.     At all times relevant to this action, the United States Department of Justice regulations implementing Title III of the ADA, 28 C.F.R. Part 36, were in full force and effect and applied to the Defendant's conduct.

69.     At all times relevant to this action, each Plaintiff had a significant hearing impairment and was a qualified individual with a disability within the meaning of Title III of the ADA, 42 U.S.C. § 12102(2).

70.     At all times relevant to this action, Laurel Hospital was a place of public accommodation within the meaning of Title III of the ADA, 42 U.S.C. § 12181(7).

71.     The objective of the ADA is to eliminate discrimination against individuals with disabilities.  Section 302(a) of the ADA, 42 U.S.C. § 12182(a), prohibits discrimination "on the basis of disability in the full and equal enjoyment of goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."

72.     Section 302(b)(2)(A)(iii) of the ADA, 42 U.S.C. § 12182(b)(2)(A)(iii), provides that discrimination under the ADA further includes "the failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services" as defined under § 12102(1)(A) of the ADA.  The term "auxiliary aids and services" under the ADA includes "qualified interpreters" who make "aurally delivered materials available to individuals with hearing impairments."

73.     Defendant's failure to provide effective communication with Plaintiffs in violation of its obligations under the ADA has directly injured, and continues to injure, Plaintiffs.

74.     Defendant's violations of the ADA mentioned above directly caused Plaintiffs to sustain past and continuing physical and emotional injuries.  Plaintiffs have suffered, are suffering, and will continue to suffer irreparable injury as a result of Defendant's pattern and practice of discrimination.  Defendant will not be harmed if ordered to comply with its pre-existing obligations under the ADA.  The public interest supports entry of appropriate injunctive relief.

75.     Plaintiffs have no plain, adequate or complete remedy at law.  They are suffering and will continue to suffer irreparable injury because of the discriminatory policies, pattern, and practice of Defendant Laurel Hospital.

## COUNT TWO

### (Violation of Section 504 of the Rehabilitation Act of 1973)

77.     Paragraphs 1 through 75 of this Complaint are incorporated by reference as if fully set forth herein.

78.     At all times relevant to this action, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 was in full force and effect and applied to the Defendant's conduct.

79.     At all times relevant to this action, the United States Department of Health and Human Services ("HHS") regulation implementing Section 504 of the Rehabilitation Act, 45 C.F.R. Part 84, were in full force and effect and applied to the Defendant's conduct.

80.     At all times relevant to this action, Plaintiffs had significant hearing impairments and were "handicapped persons" within the meaning of the Rehabilitation Act including its regulation, at 45 C.F.R. § 84.3(j), and "otherwise qualified individual[s]" within the meaning of the Rehabilitation Act including regulation, 45 C.F.R. § 84.3(k).

81.     At all times relevant to this action, Defendant was a recipient of federal funds within the meaning of the Rehabilitation Act.

82.     Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

83.     The United States Department of Health and Human Services regulations expressly provide that in the provision of health, welfare, or other social services, a program benefiting from federal financial assistance may not deny an individual with a disability benefits and services, or provide

them with benefits and services not as effective as those offered to others.  45 C.F.R. § 84.52(a)-(d). Under the federal regulations, a recipient of federal assistance must  provide auxiliary aids and services, including qualified sign language interpreters, to deaf individuals.

84.     Defendant's refusal to ensure effective communication with Plaintiffs discriminates against them on the basis of disability in violation of Section 504 of the Rehabilitation Act.

85.     Laurel Hospital violated HHS's regulations, 45 C.F.R. § 84.52(a) – (d) because it denied Plaintiffs from receiving benefits and services in provision of health, welfare, and/or other social services and also provided disparate medical treatment compared to treatment offered non-disabled individuals.  In further violation of the aforementioned HHS regulations, Laurel Hospital failed to provide Plaintiffs with auxiliary aids and services, including qualified sign language interpreters.

86.     Defendant refused to provide Plaintiffs with effective communication because of Plaintiffs' disability in violation of the Rehabilitation Act and federal regulations, which directly caused Plaintiffs to sustain past and continuing physical and emotional injuries.

87.     Plaintiffs have suffered, are suffering, and will continue to suffer irreparable injury as a result of Defendant's pattern and practice of discrimination.  Defendant will not be harmed if ordered to comply with its pre-existing obligations under the Rehabilitation Act.  The public interest supports entry of appropriate injunctive relief.

88.     Plaintiffs have no plain, adequate or complete remedy at law.  They are suffering and will continue to suffer irreparable injury because of the discriminatory policies, pattern, and practice of Defendant Laurel Hospital.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment as follows:

(A)    A preliminary and permanent injunction against Laurel Hospital, its officers, directors, agents, representatives and those persons acting in association with it, enjoining them from engaging in any practice or activity that discriminates against any person solely on the basis of that person's status as an "individual with a disability," including the practice of failing to provide qualified sign language interpreters to individuals who are deaf when they need to communicate with Laurel Hospital, and ordering it to provide deaf individuals with auxiliary aids and services necessary for effective communication, including qualified sign language interpreters, TTY's and closed captioned televisions.

(B)    A preliminary and permanent injunction requiring Laurel Hospital to modify existing, or to adopt new, practices and policies to correct discriminatory policies.

(C)    An award of compensatory damages sufficient to compensate Plaintiffs for the pain, suffering, and humiliation resulting from Laurel Hospital's discriminatory conduct against them in an amount established at trial or other appropriate date.

(D)    An award of punitive damages sufficient to punish Laurel Hospital for its discriminatory practices and policies in reckless disregard of Plaintiffs' protected rights under federal law, and for willfully and maliciously causing Plaintiffs humiliation, embarrassment, and emotional pain and suffering.

(E)    An award of attorneys' fees and costs pursuant to the ADA, 42 U.S.C. §§ 12188(a)(1) and 12205, and the Rehabilitation Act, 29 U.S.C. § 794a, and/or common law.

(F)     Any such other and further relief as this Court may deem proper and just under the

circumstances.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

This 11th day of January, 2005.

Respectfully submitted,

Lewis S. Wiener, Esq. (No. 10845)
David A. Last, Esq. (No. 15272)
Thomas R. Bundy, III, Esq. (No. 15265)
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Ave, N.W.
Washington, D.C. 20004
(202) 383-0100 (telephone)
(202) 637-3593 (facsimile)

Elizabeth Elaine Gardner, Esq.
Washington Lawyers Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, Suite 400
Washington, DC  20036
(202) 319-1000 (telephone)
(202)319-1010 (facsimile

Counsel for Plaintiffs