IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ELIZABETH GILLESPIE, et al.              :

                                         :

v.                        : Civil Action No. DKC 2005-0073

                                         :

DIMENSIONS HEALTH CORPORATION
d/b/a LAUREL REGIONAL HOSPITAL:

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this disability discrimination action is the motion by Defendant Dimensions Health Corporation d/b/a Laurel Regional Hospital to dismiss count I of Plaintiffs' complaint[1] (Paper 10) pursuant to Fed. R. Civ. P. 12(b)(6). The issues have been fully briefed and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Defendant's motion will be granted in part and denied in part.

**I.  Background**

**A.  *Factual Background***

The following facts have been alleged by Plaintiffs Elizabeth Gillespie, David Irvine, Erin Whitney, Cary Barbin, Kathryn Hale, Brian Leffler, and Xiomara Porras. Plaintiffs are

---

[1] After Defendant filed its motion to dismiss, Plaintiffs moved for leave to file an amended complaint merely to correct the name and related information of the previously misidentified Defendant. Defendant did not object, and the court granted the motion on March 15, 2005. Accordingly, Defendant's motion will be analyzed vis-a-vis Plaintiffs' amended complaint.

deaf individuals who have sought and received medical treatment at Defendant Laurel Regional Hospital ("Laurel Regional") either for themselves, or, in one instance, for a child.   To communicate effectively in medical situations, Plaintiffs require a live, qualified sign language interpreter.   On multiple occasions when Plaintiffs visited Laurel Regional independent from one another, they made repeated requests for the assistance of a live and in-person, qualified sign language interpreter to enable them to communicate effectively with hospital personnel in order to participate in their medical treatment.   On each occasion, despite specific and repeated requests for live interpreter services, the hospital refused to comply with Plaintiffs' requests. Rather, on several occasions, Plaintiffs were forced "to communicate through cryptic notes or lip-reading, . . . an extremely speculative means of communication."   Paper 20, ¶ 4.   Additionally, in some instances, rather than communicating with an in-person interpreter, Plaintiffs were able to utilize a Video Remote Interpreting ("VRI") device, which proved to be an insufficient mode of communication.[2]

---

[2] According to Plaintiffs' amended complaint, VRI uses video conferencing technology to provide remote interpreting services. Paper 20, ¶ 5.  When utilizing VRI, a sign language interpreter is located at a remote location and, through video conferencing,
(continued...)

For example, on November 1, 2003, Plaintiff Elizabeth Gillespie, accompanied by her hearing impaired husband, Plaintiff David Irvine, sought medical treatment at Laurel Regional's emergency room for, among other things, severe abdominal pain, nausea, and vomiting. After being admitted due to her serious medical condition, both she and her husband requested a live, in-person interpreter in order to communicate with the doctors, nurses, and hospital staff. Plaintiffs were told the hospital did not have any sign language interpreters. After some time had passed, and repeated requests for an interpreter went unanswered, Gillespie and Irvine were informed that the hospital had a VRI device they could utilize. However, the device was unavailable at that time because it was being used by another patient. Approximately two hours later, Gillespie was moved to the room containing the VRI device, but, in the interim, she alleges she was unable to communicate with the hospital staff and did not understand the medical advice or treatment she received during that time period. Moreover, after moving her to the room with the VRI, it took the hospital staff

---

[2](...continued)
the deaf individual and the interpreter can view each other. Facing a small camera mounted on top of a computer monitor, the deaf individual signs to the interpreter, who then voices what has been signed to hearing participants. The interpreter then signs the hearing participants' response so that the deaf individual can view the response in the monitor. *Id*.

approximately twenty to thirty minutes to set up the device due to "improper[] and inadequate[] train[ing.]"  Paper 20, ¶ 21. Once the VRI device was operational, Gillespie and Irvine engaged in an approximate ten minute consultation with the doctor, during which time he informed her that he did not know what was causing her pain, and that he was ordering an x-ray and, possibly, a CT-scan.

Following this consultation, and during all subsequent tests, procedures, and doctor consultations, Laurel Regional failed and/or refused to provide access to the VRI device, and denied Gillespie and Irvine's repeated requests for a live sign language interpreter or an effective alternative mode of communication.  Rather, the hospital staff insisted on speaking verbally to Gillespie and Irvine despite the fact that Irvine cannot read lips and Gillespie's ability to read lips was compromised by her medical condition.  Occasionally, the hospital staff would write notes to communicate with Gillespie and Irvine, but only "in a few select and extreme circumstances and only after Ms. Gillespie begged and continuously motioned for some sort of communication."  *Id.*, ¶ 22.  Even then, the hospital staff limited its writing to a "few words."  *Id*.

After the initial x-ray, a doctor returned and verbally informed them that Gillespie had an enlarged heart and that she

would need to undergo a CT-scan.  Because this information was
communicated only verbally, Plaintiffs "did not fully understand
the doctor's diagnosis or the medical treatment [Gillespie] was
going to receive."  *Id.*, ¶ 23.  After a few hours had elapsed,
a male hospital attendant arrived to take Gillespie to the CT-
scan room.  Neither Gillespie nor Irvine could understand the
attendant's instructions to them, nor the procedure which she
was about to undergo.  Further, despite repeatedly indicating to
the attendant their desire to communicate in writing, he refused
to comply.  Rather, apparently to indicate that Gillespie was to
remove some of her clothing for the procedure, the attendant
pulled on and snapped her bra strap.  *Id.*, ¶ 25.  As a result,
Gillespie refused to undergo the CT-scan unless a female nurse
was present.  Eventually, however, Gillespie underwent the
procedure.

After a few more hours elapsed, a doctor appeared to inform
Gillespie that additional tests were needed to determine the
source of the pain.  During this consultation, the doctor
primarily communicated with Gillespie and Irvine verbally, but,
per Irvine's request, sparsely used written notes.  However,
these notes were "short, confusing and cryptic."  *Id.*, ¶ 28.  At
this time, feeling exasperated with her treatment and uninformed
about her medical condition due to the hospital's failure to

communicate with Plaintiffs adequately, Gillespie informed the doctor that she wanted to leave.  Plaintiffs allege that the doctor "cavalierly recommended that Ms. Gillespie go to another emergency room at a different hospital for treatment."  Moreover, the discharge papers and written materials given to Gillespie upon their departure failed to mention the heart condition which the hospital had earlier detected.

The other Plaintiffs in this action allege similar experiences during their visits to Laurel Regional.  All of them requested a live, in-person sign language interpreter in order to communicate effectively with the hospital staff; all of their requests went unfulfilled.  In those situations where the VRI device was utilized as an alternative method of communication, it was wholly ineffective, either because the staff was inadequately trained and unable to operate the VRI device, because Plaintiffs were unable to understand the video interpreter due to the poor quality of the video transmission, or both.[3]  As a consequence, Plaintiffs content that they have

---

[3] Plaintiff Whitney alleges that on multiple visits to Laurel Regional when the VRI device was utilized, she could not understand the video interpreter due to the poor quality of the video transmission, and because she was unable to sit up in order to see the monitor.  *See* Paper 20, ¶¶ 34, 38, 41. Plaintiff Hale alleges that on multiple visits to Laurel Regional, the VRI device proved utterly ineffective because the improperly and inadequately trained hospital staff was unable to
(continued...)

been denied the benefit of effective communication with physicians and other health care providers, denied the opportunity to participate in their treatment, and denied the full benefit of the health care services provided by Laurel Regional.

### B.   Procedural Background

On January 11, 2005, Plaintiffs filed suit, alleging that Laurel Regional violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794, by failing to provide Plaintiffs with an appropriate auxiliary aid necessary to ensure effective communication, thereby denying them full and equal medical treatment because of their disability.   Plaintiffs allege that Laurel Regional's unlawful conduct has directly caused Plaintiffs to sustain past and continuing physical and emotional injuries.   They further allege that Plaintiffs "have suffered, are suffering, and will continue to suffer irreparable injury as a result of [Laurel Regional's] pattern and practice of discrimination."   *Id.*, ¶ 74.

---

[3](...continued)
operate the equipment. *See* id., ¶¶ 55, 56.  Plaintiff Leffler alleges that he was informed by hospital staff that the VRI device, for reasons unknown to him, was simply "not available" during his emergency visit to the hospital.  *Id.*, ¶ 58.

On February 10, 2005, Defendant filed a motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), Plaintiffs' ADA claim (count I).  Defendant contends that because injunctive relief is the only remedy available to Plaintiffs under count I, Plaintiffs lack standing to assert this claim, and, accordingly, count I must be dismissed.  For the following reasons, Defendant's motion will be granted as to Plaintiffs Whitney and Leffler, but denied as to the remaining Plaintiffs.

## II.  Standard of Review

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint.  *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  Accordingly, a 12(b)(6) motion ought not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Except in certain specified cases, a plaintiff's complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

In its determination, the court must consider all well-pled allegations in a complaint as true, *see Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff.  *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).  The court must disregard the contrary allegations of the opposing party.  *See A.S. Abell Co. v. Chell*, 412 F.2d 712, 715 (4th Cir. 1969).  The court need not, however, accept unsupported legal allegations, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

## III. Analysis

Title III of the ADA applies to privately operated public accommodations, including hospitals, and prohibits discrimination "on the basis of disability in the full and equal enjoyment of goods, services, facilities, privileges, advantages, or accommodations."  42 U.S.C. ¶ 12182(a).  Although Title III does not allow a private party to seek damages, it does provide for injunctive relief.  *Dudley v. Hannaford Bros.*

9

*Co.*, 333 F.3d 299, 304 (1st Cir. 2003); *Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133, 1136 (9th Cir. 2002); *Proctor v. Prince George's Hosp. Ctr.*, 32 F.Supp.2d 820, 824 (D.Md. 1998). To establish standing for injunctive relief, a plaintiff must first demonstrate that he will suffer an injury in fact which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).[4] Regarding an "injury in fact," the Supreme Court has explained that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). In *Lyons*, the Court held that a plaintiff who had been subjected to a "chokehold" by the Los Angeles police would have had to allege not only that he would have another encounter with the police, but that he was likely to suffer similar injury during that encounter in order to obtain injunctive relief. *Lyons*, 461 U.S. at 105-06.

---

[4] In addition to "injury in fact," a plaintiff must also demonstrate that the conduct complained of will cause the injury alleged, and that it is likely, not speculative, that the injury will be redressed by a favorable decision. *Id*. These elements are not at issue here.

"Absent a sufficient likelihood that he will again be wronged in a similar way," the Court stated, "Lyons is no more entitled to an injunction than any other citizen of Los Angeles." *Id*. at 111.

In support of its argument, Defendant cites to several ADA opinions, including two from this court, which have held that the plaintiffs lacked standing to pursue injunctive relief. It asserts that the "plain and inescapable conclusion given the [cited] body of law is that Plaintiffs simply lack standing to pursue injunctive relief under Title III of the ADA because they face no real and immediate threat of harm." Paper 18 at 16. A careful reading of these cases, however, demonstrates that Defendant's reliance is misplaced.

In *Proctor*, a hearing-impaired plaintiff sued the medical center ("PGHC") that treated him for severe injuries arising from a motorcycle accident, alleging that he was denied live interpretive services during the course of his treatment, in violation of Title III of the ADA. 32 F.Supp.2d at 821. Raising the issue of standing *sua sponte*, this court dismissed his Title III claim on the basis that he had failed to "demonstrate the requisite predicate for seeking" injunctive relief. *Id*. at 824. Citing some of the same cases on which Defendant now relies, the court concluded that Proctor had

11

failed to show an injury in fact, i.e., a real and immediate threat of future injury at the hands of the defendant.   The court stated:

> By now, several months have passed since Plaintiff was discharged from PGHC.   Thus, even if Plaintiff correctly alleges that he was the victim of discrimination, the present record does not reflect any on-going discrimination against him or that he is likely to return to PGHC in the near future. While the [Office for Civil Rights of the United States Department of Health and Human Services'] findings do not have binding effect in this court, the complaints and order evidence that issues have arisen regarding whether PGHC is in compliance with the ADA. However, the relevance of the past complaints is limited by the fact that the hospital subsequently amended its policy designed to prevent violations.   Plaintiff has not challenged the policy's adequacy. Instead, Mr. Proctor contends that PGHC failed to follow it when treating him. Additionally, Plaintiff must demonstrate that any violation resulted from conditions that make repeated violations likely if Mr. Proctor should return to PGHC.

*Id*. at 825.[5]  Accordingly, the court concluded that on the record it had before it, it was "unlikely an injunction would be appropriate."  *Id*.

Similarly, in *Falls v. Prince George's Hospital Center*, 1999 WL 33485550, at *1 (D.Md. Mar. 16, 1999), this court entered judgment in favor of the defendant, PGHC, on the plaintiff's ADA claim because "there was [no] 'actual and imminent' threat" to the plaintiff's hearing-impaired daughter's rights, and, thus, "she [did] not have standing to seek injunctive relief."  1999 WL 33485550, at *6.  Critical to this court's conclusion was that the  record neither reflected any on-going discrimination by PGHC against the plaintiff's daughter, nor that she was likely to return to PGHC in the near future.  Indeed, the plaintiff stated in her deposition that she did not want to use the services of PGHC again, even if her daughter was "near death."  *Id*.  Accordingly, the plaintiff was unable to establish

---

[5] In July of 1991 and January of 1992, deaf former PGHC patients filed complaints with the Office for Civil Rights of the United States Department of Health and Human Services ("OCR"), alleging that the PGHC failed to provide them with effective communication during their treatment.  In December of 1993, the OCR found that PGHC was in violation of § 504 of the Rehabilitation Act.  Shortly before the OCR released its finding, and apparently as a result of the OCR's investigation, PGHC revised its policy on accommodations for hearing impaired patients.  *Id*. at 822.  Thus, well before Proctor's visit to PGHC, it had revised its policy in an attempt to comply with federal anti-discrimination laws.

that her daughter faced "a real and immediate threat of future harm from Defendant, and not merely a conjectural or hypothetical threat." *Id*.

Those cases are significantly different than this one. First, both *Proctor* and *Falls* involved plaintiffs alleging violations of the ADA based on one visit to PGHC, as opposed to multiple plaintiffs, some of whom are alleging multiple violations on multiple occasions. *See* Paper 20, ¶¶ 18, 31, 36, 53, 55, 56. Second, in both *Proctor* and *Falls*, the hospital provided, or made arrangements to provide, an interpreter for part of the plaintiffs' respective visits, although for the bulk of their stay, interpreters were not provided. *Proctor*, 32 F.Supp.2d at 824; *Falls*, 1999 WL 33485550, at *4. In stark contrast, Plaintiffs allege in this case that despite their repeated requests for a live and in-person interpreter, none was ever provided, and that the VRI device the hospital sparingly attempted to utilize was utterly ineffective. Moreover, in both *Proctor* and *Falls*, the records reflected that neither plaintiff was likely to return to PGHC in the near future. *Proctor*, 32 F.Supp.2d at 825; *Falls*, 1999 WL 33485550, at *6. As mentioned above, Ms. Falls testified in her deposition that she would not take her daughter back to PGHC, even if she was "near death." In contrast, Plaintiffs Gillespie, Irvine, Barbin, Hale, and

14

Porras have alleged that they have "sought and received, and will likely continue to seek, medical treatment" from Laurel Regional for themselves and their family members.  Paper 20, ¶¶ 9, 10, 12, 13, 15.  This allegation is buttressed by the proximity of Laurel Regional to their homes.  Each of these five allege that they live between two and five miles from the hospital, making it the closest and most convenient medical center to their homes.  *See id.*  Far from alleging that they will never visit Laurel Regional again, these Plaintiffs allege that they will likely continue to seek medical treatment there. This is further supported by the fact that Gillespie and Hale both made repeated visits to Laurel Regional even after being denied the services of a sign language interpreter on previous visits.  *Id.*, ¶¶ 18 (Gillespie), 55–56 (Hale).

Finally, Plaintiffs are alleging that they have been injured, and will likely continue to be injured, by Defendant's "policies, pattern, and practice."  *Id.*, ¶¶ 74, 75.  In contrast, in *Proctor*, prior to the plaintiff's encounter with PGHC, it had amended its policy in order to prevent ADA violations.  Thus, this court made clear that Proctor was not "challeng[ing] the policy's adequacy," but rather "that PGHC failed to follow it when treating him."  *Proctor*, 32 F.Supp.2d at 825.  Similarly, in *Falls*, the plaintiff was not challenging

the policy of PGHC, which, according to the then-existing PGHC Guide to Services, was that "sign language interpreters [were] available upon request."  1999 WL 33485550, at *4.  Indeed, on a previous visit to PGHC, Ms. Falls had utilized an interpreter for her daughter.  *Id.*, at *3.  Rather, Ms. Falls brought suit on the basis that during her last, and according to her, final visit to PGHC, it failed to provide interpreters despite repeated requests.  *Id.*, at **3-4.  Thus, she was not challenging PGHC's policy, but rather its failure to observe it.

This critical difference makes it less likely that the plaintiffs in *Proctor* and *Falls* would be aggrieved in the event of a future visit to PGHC than Plaintiffs here would be during future visits to Laurel Regional.  Given that Plaintiffs have alleged that it is the policy, pattern, and practice of Laurel Regional to not provide live, in-person, qualified sign interpreters, but rather to resort to occasional and sporadic note-taking, and to a VRI device that its staff is allegedly improperly and inadequately trained on, and which on numerous occasions proved ineffective due to the quality of the picture, it is likely that Plaintiffs will be harmed again if and when, as they allege, they return to Laurel Regional. *See Proctor*, 32 F.Supp.2d at 825 ("Additionally, Plaintiff must demonstrate that

16

any violation *resulted from conditions that make repeated violations likely* if Mr. Proctor should return to PGHC.") (emphasis added).   Accordingly, reliance on this court's previous rulings in *Proctor* and *Falls* is misplaced.

Neither do the cases Defendant cites from outside this district support its position.   First, in *Aikins v. St. Helena Hosp.*, 843 F.Supp. 1329 (N.D.Cal. 1994), the court dismissed the plaintiff's claim for injunctive relief under Title III because the plaintiff "ha[d] not shown that defendants' alleged discrimination [was] on-going and that she [was] likely to be served by defendants in the near future." *Id.* at 1334.   Indeed, this latter point would have been difficult for the plaintiff to demonstrate given that she merely owned a mobile home near the defendant hospital and only stayed there "several days each year." *Id.* at 1333.[6]

---

[6]   The *Aikins* court dismissed the ADA count with leave to amend "to show that Mrs. Aikins faces a real and immediate threat of future injury at the hands of defendants."   After amending her complaint to add additional allegations that she considered it "reasonably possible that she might need to seek services from the hospital, and that defendants . . . engaged in 'a pattern and practice of violating' pertinent anti-discrimination statutes," the court, in an unpublished opinion, denied the defendants' motion to dismiss, notwithstanding the plaintiff's relatively infrequent visits to her mobile home. *See Aikins v. St. Helena Hosp.*, 1994 WL 794759, at *3 (N.D.Cal. Apr. 4, 1994).

17

In *Schroedel v. New York Univ. Med. Ctr.*, 885 F.Supp. 594 (S.D.N.Y. 1995), the court dismissed the plaintiff's claim for injunctive relief on standing grounds because the defendant hospital was "not the nearest medical center to either [the plaintiff's] residence or place of employment," the plaintiff had not alleged that "she regularly utilizes the services of the Hospital for any specific medical condition," and, on two prior occasions before the events giving rise to the cause of action, the plaintiff had visited a different hospital. *Id*. at 599.

Finally, in *Freydel v. New York Hosp*., 2000 WL 10264 (S.D.N.Y. Jan. 4, 2000), the court dismissed the plaintiff's claim for injunctive relief on standing grounds because there were "eleven [health] care centers closer to [the plaintiff's] home" than the defendant hospital. *Id*., at *3. Additionally, her primary care physician no longer worked at the defendant hospital, "thus severing [the plaintiff's] previous link with the institution." *Id*. Perhaps most important, however, was the fact that the hospital "ha[d] amended its policy of providing translation services in ways which [made] a recurrence of [the] alleged violation of her rights even more unlikely." *Id*. Thus, even if the plaintiff were to return to that particular hospital, its new policy made it unlikely that she would experience the same treatment.

18

All three of these cases present critically different factual situations from the one set forth by Plaintiffs, who assert that the alleged discrimination is an ongoing manifestation of Laurel Regional's policy and practice, and where five of the Plaintiffs continue to reside within two to five miles of the hospital, supporting their assertions that they likely will seek treatment there in the future.[7]

---

[7] Similar analysis of the remaining cases Defendant cites reveals that critical and important differences exist between those cases and Plaintiffs' which made dismissal appropriate in the former, but inappropriate here. *See, e.g., Constance v. State Univ. of New York Health Science Ctr. at Syracuse*, 166 F.Supp.2d 663 (N.D.N.Y. 2001) (finding plaintiffs lacked standing because they only traveled to the Syracuse area, where the hospital was located, a few times a year, they had not been to the hospital prior to or after the incident giving rise to the action, and one plaintiff sought cancer treatment from her oncologist at another hospital in another city); *Hoepfl v. Barlow*, 906 F.Supp. 317, 320 (E.D.Va. 1995) (finding plaintiff lacked standing because at the time of the suit, she "reside[d] in a different state," making it "highly unlikely that she will ever again be in a position where any discrimination by [the defendant] against disabled individuals will affect her personally"). Moreover, in *Naiman v. New York Univ.*, 1997 WL 249970 (S.D.N.Y. May 13, 1997), the court dismissed for lack of standing the plaintiff's claim for injunctive relief but granted him leave to amend to allege facts sufficient to demonstrate standing. *Id.*, at *5. Interestingly, and of some relevance here, is that the court noted that "[a]lthough not exhaustive nor necessarily dispositive, such allegations (if they can be made on the facts) might include whether [the plaintiff] suffers from a recurring medical condition *and the reasons why [the defendant hospital,] as opposed to some other hospital, is the facility which [the plaintiff] would go to in an emergency*." *Id.* (emphasis added).

Accordingly, these cases provide little or no support for Defendant's position.

The main cases to which Defendant cites, arguably beginning with *Aikins*, 843 F.Supp. 1329, all hold that injunctive relief is not available for isolated instances of medical personnel refusing to provide auxiliary aids to patients who have not alleged or demonstrated a likelihood of seeking and being denied treatment without the necessary aids in the future. "However, where a public accommodation in the health care field adheres to its policies of refusing to provide the requested auxiliary aid or has denied treatment altogether to an individual who seeks to receive treatment at the facility, injunctive relief may be available." *Majocha v. Turner*, 166 F.Supp.2d 316, 325 (W.D.Pa. 2001). In *Majocha*, the plaintiffs filed suit under the ADA and Rehabilitation Act against a doctor and his partners for the doctor's refusal to supply a qualified interpreter during a medical consultation for their fifteen month old son. The plaintiffs averred that they would still like their son to be evaluated and treated by the defendants, but "that they [were] prevented from doing so because defendants steadfastly refuse[d] to alter their procedures for dealing with hearing impaired parents." *Id.* at 325. The evidence suggested that the doctor who the plaintiffs initially saw, and to whom they would like to

take their son in the future, always used written communications by notes in such cases and intended to continue that practice despite plaintiffs' exertion of rights claimed under the ADA. *Id*. Accordingly, the court concluded that the plaintiffs did have standing to seek injunctive relief, and that "they [would] have the opportunity to prove their case for such relief at trial." *Id.; see also Mayberry v. Von Valtier*, 843 F.Supp. 1160, 1166 (E.D.Mich. 1994) (holding plaintiff may seek injunctive relief under Title III of the ADA where doctor refused to treat deaf patient because she did not want to provide a sign interpreter and where evidence suggested she would not revise her policy and "intended to refuse to hire an interpreter in the future"); *cf. Dudley v. Hannaford Bros. Co.*, 146 F.Supp.2d 82 (D.Me 2001) (where defendant declines to revise its policies which resulted in discrimination against plaintiff on the basis of his alleged disability, plaintiff is not required to perform a futile act of seeking the services again; injunctive relief is available), *aff'd*, 333 F.3d 299 (1st Cir. 2003) (*Dudley II*) (stating that "while there is no absolute certainty that Dudley would be denied the right to purchase alcoholic beverages during a future visit to [defendant's store], the likelihood of a denial seems substantial. No more is exigible to support a Title III right of action.").

Similarly, Plaintiffs allege that they have been harmed, and will likely continue to be harmed, by the policy, pattern, and practice of Defendant.  Their claim is not that Defendant acted contrary to an ADA compliant policy, but rather that the existing and on-going policy and practice itself violates their rights under the ADA.  This claim is supported by the allegations that on multiple occasions, Laurel Regional has denied requests to provide live, in-person interpreters, and instead, has attempted to utilize alternative, and allegedly, ineffective methods of communication.  Moreover, Plaintiffs allege that they have sought, and will likely continue to seek, medical treatment from Laurel Regional.  This allegation is supported by the fact that Plaintiffs Gillespie, Irvine, Barbin, Hale, and Porras reside within two to five miles of Laurel Regional, thus, making it highly likely that Laurel Regional, rather than some other medical facility, will be where they go in an emergency.  Additionally, Plaintiffs Gillespie and Hale have alleged multiple visits to Laurel Regional, despite what they allege was unlawful treatment in the past.  This fact only bolsters the allegation that they will likely return there in the future.  Given the proximity of their residences to Laurel Regional, their strikingly common past experiences with the hospital, and the fact that they seek to enjoin what they allege is an unlawful policy, pattern, and practice, the court

22

concludes that Plaintiffs Gillespie, Irvine, Barbin, Hale, and Porras have sufficiently alleged a real and immediate threat of future injury at the hands of Defendant in order to have standing to seek injunctive relief. *Cf. Dudley II*, 333 F.2d at 306 ("To sum up, the question before us is whether Dudley has proffered enough evidence to establish a real and immediate threat that Hannaford's policy will again result in a Title III violation. Given the remedial purpose underlying the ADA, courts should resolve doubts about such questions in favor of disabled individuals."). Whether Defendant's actions violate Plaintiffs' rights under Title III of the ADA, entitling them to injunctive relief, is not the question to be decided today. Rather, it is whether these Plaintiffs, or some of them, have standing to seek such relief. The court concludes that some do. Accordingly, Defendant's motion to dismiss count I as to Plaintiffs Gillespie, Irvine, Barbin, Hale, and Porras will be denied.

However, because Plaintiffs Whitney and Leffler now reside outside of the state of Maryland, it is much less likely that they will seek medical treatment at Laurel Regional in the future. Thus, the likelihood that these two Plaintiffs will ever be harmed again by Defendant is minimal at best. *Hoepfl*, 906 F.Supp. at 320 (finding plaintiff lacked standing because at the time of the suit, she resided in a different state, making

it "highly unlikely that she will ever again be in a position where any discrimination by [the defendant] against disabled individuals will affect her personally"). "Absent a sufficient likelihood that [they] will again be wronged in a similar way," *Lyons*, 461 U.S. at 111, they lack standing to seek injunctive relief. Accordingly, Defendant's motion to dismiss count I for lack of standing as to Plaintiffs Whitney and Leffler will be granted.

## IV.  Conclusion

For the foregoing reasons, Defendant's motion to dismiss count I for lack of standing is denied in part and granted in part. The motion is denied as to Plaintiffs Gillespie, Irvine, Barbin, Hale, and Porras, and granted as to Plaintiffs Whitney and Leffler. A separate Order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

May 16, 2005
